T.C. Memo. 2004-2

UNITED STATES TAX COURT

HOWARD H. THOMPSON, JR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17514-99.                    Filed January 5, 2004.

Howard H. Thompson, Jr., pro se.

<u>Robert M. Fowler</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-
ciencies in, additions under section 6651(a)(1)[1] to, and
accuracy-related penalty under section 6662(a) on petitioner's

---

[1]All section references are to the Internal Revenue Code in
effect for the years at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

Federal income tax (tax):

| Year | Deficiency | Additions to Tax | Accuracy-Related Penalty |
|------|-----------|------------------|--------------------------|
| 1994 | $25,531 | $6,243.25 | -- |
| 1995 | 38,555 | -- | $7,711 |
| 1996 | 89,571 | 22,304.75 | -- |

The issues remaining for decision are:[2]

(1) Does petitioner have certain unreported income for each of the years 1995 and 1996?  We hold that he does.

(2) Is petitioner liable for 1996 for an addition to tax under section 6651(a)(1)?  We hold that he is.

FINDINGS OF FACT

Most of the facts have been deemed established pursuant to Rule 90(c) and pursuant to the Court's Order under Rule 91(f) dated February 11, 2003.

At the time he filed the petition in this case, petitioner resided in Minnetonka, Minnesota.

During each of the years at issue, Uptime Nutrition, Inc. (Uptime Nutrition), employed petitioner.

On September 1, 1994, petitioner opened a checking account (petitioner's checking account) in the name of Norwest Realty, Inc., of Minnetonka (Norwest Realty) at First Bank in Edina,

---

[2]In addition to the issues remaining for decision listed below, there are other questions relating to certain determinations in the notice of deficiency (notice) that are computational in that their resolution flows automatically from our resolution of the remaining issues that we address herein and from the concessions of the parties.

Minnesota (First Bank). During each of the years at issue, petitioner used petitioner's checking account as his personal account, making personal deposits into, and writing personal checks on, that account. Norwest Realty has never filed a tax return.

Weavewood, Inc.

In 1947, petitioner's father, Howard Thompson, Sr. (Mr. Thompson), who died in 1991, founded Weavewood, Inc. (Weavewood), a closely held corporation located in Minneapolis, Minnesota (Minneapolis). At all relevant times, Weavewood engaged in the business of manufacturing wood products, such as bowls and trays. At such times, Weavewood maintained a checking account (Weavewood's checking account) at Norwest Bank in Minneapolis (Norwest Bank-Minneapolis).

Beginning in 1947 and continuing throughout each of the years at issue, various members of petitioner's family managed Weavewood. From August 1995 until July 12, 1996, petitioner served as president, secretary, treasurer, and chairman of the board of directors (board) of Weavewood. Weavewood did not compensate petitioner for serving in those positions.

Weavewood's Company Vehicle

On February 16, 1996, petitioner signed a $10,000 check (Weavewood's February 16, 1996 check) payable to an individual named Paul Robinson (Mr. Robinson) and drawn on Weavewood's

checking account.  Weavewood's February 16, 1996 check represented a partial payment for a Cadillac that Weavewood purchased to use as its company vehicle.  Petitioner's mother, Virgene Thompson (Ms. Thompson), among others, drove that Cadillac in connection with Weavewood business.

Weavewood's Termination of Petitioner

A letter dated July 10, 1996, from Ms. Thompson to petitioner stated in part as follows:

> Pursuant to the authority vested to me as Personal Administrator of the Estate of Howard H. Thompson * * *.  Please be advised that in the best interests of Weavewood, Inc. you are being removed, effective immediately, from any and all positions that you now may have at Weavewood, Inc. * * *

> Effective immediately, you will no longer have any physical access to the offices of Weavewood, Inc. or access to the financial accounts of Weavewood, Inc.  If you attempt physical access to Weavewood, Inc. or its financial accounts, the proper authorities will be contacted and you will be removed immediately and procedures for a Restraining Order will be commenced.

Minutes of a Weavewood board meeting held on July 12, 1996, stated in part as follows:

> Present at the meeting were Virgene Thompson, Vice President, Gail Thompson Mosley, Barbara Thompson Meyer, and Peter Meyer.

> It was discussed that a decision had been reached by Virgene Thompson to formally remove Howard Thompson, Jr., from all corporate matters of Weavewood, Inc., including but not limited to:  the offices held as Chariman [sic] of the Board, President, Secretary, and Treasurer.  Howard Thompson, Jr., was also removed as the signer for the Corporate Bank Account at the Norwest Bank and any other financial decision making in regards to Weavewood, Inc.  A new corporate bank ac-

count was established by Virgene Thompson, naming Gail Thompson Mosley and Barbara Thompson Meyer as the only signers.

New officers were appointed as follows:

Chairman of the Board - Virgene Thompson
President - Gail Thompson Mosley
Vice President - Virgene Thompson
Secretary - Barbara Thompson Meyer
Treasurer - Barbara Thompson Meyer

Appointments were duly voted upon and passed unanimously.

Howard Thompson, Jr., left the Weavewood premises in the corporate car, a 1992 Cadillac Allante convertible, taking with him the contents of the corporate safe, neither of which he is entitled to.

John Caylor remains as the Weavewood corporate accountant.

On July 12, 1996, Ms. Thompson, acting as vice president of Weavewood, removed petitioner from holding any positions at Weavewood and from having any authority with respect to Weavewood, including any signing authority that petitioner had had over Weavewood's checking account.

Weavewood's Litigation Against Petitioner

On a date not disclosed by the record on or before July 15, 1996, Weavewood, Ms. Thompson, and petitioner's sister Gail Thompson Mosley (Ms. Mosley) (collectively, the plaintiffs in Weavewood's litigation against petitioner) filed a motion for a temporary restraining order against petitioner. On July 15, 1996, the District Court, Fourth Judicial District, County of Hennepin (County District Court) issued an order that stated in

part as follows:

The above entitled matter came on for hearing * * * pursuant to Plaintiffs' Motion for a Temporary Restraining Order against Defendant [petitioner]. Plaintiffs Gail Mosley Thompson and Virgene Thompson appeared by and through their attorney Michael L. Puklich; Plaintiff Weavewood Inc, by and through Samuel Dalluge and Defendant through his attorney William Skolnick.

Based upon the argument of counsel, the Affidavits and Complaint filed herein, and being duly advised in the premises, it is hereby ordered that Defendants [sic] shall be, and hereby are:

1.  Temporarily restrained and enjoined:

a.  From moving, removing, any property off the premises of Weavewood * * *;

b.  From entering the premises of Weavewood * * * and;

c.  From writing checks out of the corporation's corporate checking account * * *;

2.  Further, Defendant is ordered and directed to provide to the Court under seal all books and records of Weavewood Inc. which defendant has in his possession during the Court's regular hours * * *

3.  Further, Defendant is ordered and directed to immediately return all property owned by Weavewood Inc. which Defendant has in his possession to the office of the attorney for plaintiffs * * * to be held until further order of this Court, not to be returned to or reviewed by plaintiffs personally until further order of the Court.

4.  The next hearing on this matter is scheduled to be held on Monday, July 22, 1996 at 12:00 noon.

This Order shall be in effect until further order of this Court. * * *

On July 17, 1996, Weavewood, one of the plaintiffs in

Weavewood's litigation against petitioner, filed in the County

District Court what was identified as a notice of motion and

motion (motion). That motion stated in part as follows:

> PLEASE TAKE NOTICE that on the 22nd day of July, 1996 at 12:00 p.m. of said day * * * the undersigned will move the Court for an Order as follows:
>
> 1. Temporarily restraining and enjoining Howard Thompson from the following:
>
> a. From moving, removing, any property off the premises of Weavewood, Inc. * * *
>
> b. From entering the premises of Weavewood, Inc. * * * and;
>
> c. From writing checks out of the corporation's corporate checking account * * *
>
> 2. Further, Defendant is ordered and directed to provide to the Court under seal all books and records of Weavewood, Inc. which Defendant has in his possession during the Court's regular hours * * *
>
> 3. Further, Defendant is ordered and directed to immediately return all property owned by Weavewood, Inc. which Defendant has in his possession to the office of the attorney for plaintiff's * * * to be held until further order of this Court, not to be returned to or reviewed by plaintiff's personally until further order of this court.
>
> This Motion is based upon the Order from this Court dated July 15, 1996 and upon all of the files, records and proceedings herein.

On July 22, 1996, in preparation for a hearing that the

County District Court scheduled on that day with respect to the

temporary injunction that Weavewood sought against petitioner,

Weavewood, one of the plaintiffs in Weavewood's litigation

against petitioner, filed a memorandum of law (Weavewood's

memorandum of law).  Weavewood's memorandum of law stated in part

as follows:

> This memorandum of law is submitted in support of Plaintiff's Motion for a Temporary Injunction preventing Plaintiff's former President, Board of Director and Secretary Treasurer, Defendant from continuing to use certain equipment, financial documents and corporate funds that he has misappropriated from Plaintiff, Weavewood, and requiring Defendant to return the equipment, corporate funds and financial documents and preventing Defendant access to the premises of Weavewood, Inc.

> FACTS

> Plaintiff, Weavewood, Inc. is a family run business and has been in the business of making wood products since the 1940's.  In 1991 the sole shareholder of the company, Howard Thompson, Sr. past [sic] away and his estate is currently in probate.  Pursuant to his Last Will and Testament he appointed his wife Virgene Thompson as personal administrator and also gave her the authority to make all of the decisions regarding the business. * * * Approximately one year ago she appointed Howard Thompson, Jr. her son to the positions of President, Chairman of the Board and Secretary/Treasurer, he was also the only signor on the corporate checking account. * * *

> Thereafter the business suffered financially, bills were not being paid, taxes were not being paid, stocks which the company had owned for decades were being sold and corporate funds were being used by Howard Thompson, Jr. for non-business purposes. * * * Based on these findings, Virgene Thompson removed Howard Thompson, Jr. from his corporate officer positions on July 12, 1996. * * * A board meeting followed appointing new officers.

> *       *       *       *       *       *       *

> The company has since learned from Norwest Bank that at approximately 5:00 p.m. on July 12, 1996 after Howard Thompson had been removed from his officer positions, he wrote a check to himself from the Weavewood account in the amount of $16,000.00. * * *

Since this court's order of July 15, 1996, Defendant has written at least two checks on the Weavewood checking account for non-business purposes. Defendant was taken off as signor on the account on Monday July 15 and on Tuesday the account was closed. On Tuesday, Defendant attempted to cash another check made payable to himself from the corporate account in the amount of $16,750.00. $10,000 in a cashiers check and $6,750.00 in cash. Norwest was able to stop payment on the cashiers check but because of a mistake made by the bank Defendant did receive $6,750.00 in cash. * * *

  *     *     *     *     *     *     *

Regarding the computer equipment. Defendant has acknowledged to Virgene Thompson in a conversation that he would return the computer equipment. However, this has not happened. * * * Ironically, the computer which is currently missing was taken while we were at the hearing on Monday, July 15, 1996. * * *

Regarding past misappropriation of corporate funds. Weavewood has retained the services of John D. Caylor, C.P.A. to review certain financial documents it still had in its possession. It is the opinion of Mr. Caylor that corporate funds have been misappropriated by Defendant. * * * [Reproduced literally.]

Attached to Weavewood's memorandum of law were two affidavits by Ms. Thompson (Ms. Thompson's affidavit and Ms. Thompson's supplemental affidavit, respectively), an affidavit by Ms. Mosley (Ms. Mosley's affidavit), and an affidavit by Weavewood's accountant John Caylor (Mr. Caylor's affidavit).

Ms. Thompson's affidavit, dated July 15, 1996, stated in part as follows:

I, Virgene Thompson being first duly sworn, do hereby state and depose as follows:

1.   That your affiant was the wife of Howard Thompson Sr. and the personal administrator of Howard

Thompson's estate and has been involved in the operation of Weavewood, Inc., for approximately 40 years and accordingly is familiar with the facts and circumstance [sic] surrounding this motion for a temporary restraining order. * * *

2.    That on Friday, July 12, 1996, a board of directors meeting was held at the corporate offices of Weavewood, Inc. * * *

\*        \*        \*        \*        \*        \*        \*

4.    During the board of directors meeting it was resolved that Howard Thompson Jr. was to be removed as the Chairman of the Board, President, Secretary and Treasurer of Weavewood, Inc. and that said removal was effective July 12, 1996.  That on July 12, 1996, Howard Thompson was personally served with a letter of termination/removal.  The termination/removal letter was written by your Affiant * * *.

5.    That on July 12, 1996, after receiving the letter of termination/removal, Howard Thompson made the following threats:

    a.    to take corporate funds by writing a corporate check to himself;

    b.    to take corporate equipment;

    c.    to take/remove corporate documents from the corporation;

    d.    to move corporate operations to a different site;

    e.    to sell the corporate automobile and;

    f.    threatened that the corporate building "would not be standing" inferring that he was going to burn it.

6.    That on Friday, July 12, 1996, after Howard Thompson had been removed he (Howard Thompson) changed the door locks at Weavewood, Inc.

7.    That on Friday, July 12, 1996, your affiant witnessed Howard Thompson remove corporate documents

from the corporation.

Ms. Thompson's supplemental affidavit, which was undated, stated in part as follows:

> I, Virgene Thompson, being first duly sworn, do hereby state and depose as follows:
>
> 1.  That this is a supplemental affidavit to * * * [Ms. Thompson's affidavit]
>
> 2.  That approximately 1 year age [sic] your affiant appointed the defendant Howard Thompson to the positions of President, Chairman of the Board, Secretary/Treasurer and he was also the only signor on the Weavewood bank account with Norwest.
>
> 3.  That the Cadillac owned by Weavewood, Inc. has been returned to Anderson Cadillac * * *.
>
> 4.  That Howard Thompson has acknowledged to your affiant that he would return the computer equipment that was taken, however, to the best of your affiant's knowledge this equipment has not been returned. That during the same meeting your affiant served the Temporary Restraining Order on Defendant [petitioner] and * * * advised Defendant that he had to appear at the hearing scheduled for Monday July 22, 1996. Defendant told your affiant that he "did not have [to] be at any hearing."
>
> 5.  That your affiant has not received any corporate monies in the form of a corporate distribution or otherwise since approximately August of 1995. That your affiant has never received the proceeds indicated by the attached checks,[3] particularly the check for $20,000.00. Your affiant also does not remember endorsing any checks for deposit into your affiant's

---

[3]The checks attached to Ms. Thompson's supplemental affidavit included the following three checks (discussed below) that were payable to her, drawn on Weavewood's checking account, and signed by petitioner:  a $20,000 check dated Feb. 15, 1996, a $5,000 check dated Feb. 20, 1996, and a $1,000 check, the date of which is not shown in the Court's copy of the attachments to Ms. Thompson's supplemental affidavit.

personal checking account.

Ms. Mosley's affidavit, dated July 15, 1996, stated in part as follows:

I, Gail Thompson Mosley being first duly sworn, do hereby state and depose as follows:

1.   That your affiant is the daughter of Howard Thompson Sr. and Virgene Thompson and is the newly appointed President of Weavewood, Inc. and accordingly is familiar with the facts and circumstances surrounding this motion for a temporary restraining order.

2.   That your affiant was an employee of Weavewood, Inc., for approximately 13 years.

3.   That on Friday, July 12, 1996, a board of directors meeting was held at the corporate offices of Weavewood, Inc. * * *

*      *      *      *      *      *      *

5.   During the board of directors meeting it was resolved that Howard Thompson Jr. was to be removed as the Chairman of the Board, President, Secretary and Treasurer of Weavewood, Inc. and that said removal was effective July 12, 1996.  That on July 12, 1996, Howard Thompson was personally served with a letter of termination/removal * * *.

6.   That prior to July 12, 1996, Howard Thompson threatened to take corporate funds by writing a corporate check to himself.

7.  That on July 12, 1996, after receiving the letter of termination/removal, Howard Thompson made the following threats:

a.   to take corporate equipment

b.   to take/remove corporate documents from the corporation

c.   to move corporate operations to a different site

    d.    to sell the corporate automobile

    e.    threatened that the corporate building "would not be standing" inferring that he was going to burn it;

8.    That on Friday, July 12, 1996, Howard Thompson changed the door locks at Weavewood, Inc.

9.    That on Friday, July 12, 1996, your Affiant called the Golden Valley Police Department to have Mr. Thompson removed and that the Golden Valley Police ordered the parties to leave and took the keys to the building pending an order from the Court releasing the keys.

10.    That at 12:00 p.m. today [July 15, 1996] an employee of Weavewood called your affiant and reported that Howard Thompson had some how [sic] gained access to the building and was at the corporate offices.

Mr. Caylor's affidavit, dated July 22, 1996, stated in part

as follows:

I, John D. Caylor, being first duly sworn, do hereby state and depose as follows:

1.    That your affiant is a certified public accountant licensed to practice in the State of Minnesota.

2.    That your affiant has been the accountant for Weavewood, Inc. since August 24, 1995 and is accordingly familiar with the tax and financial affairs of Weavewood, Inc.

3.    For purposes of this hearing, your affiant has been retained to review certain financial documents of Weavewood, Inc. including but not limited to:

    a.  Canceled checks

    b.  Bank statements

    c.  Computerized check ledger

d.   Investment Broker Statements

4.   That your affiant has also reviewed certain American Express Credit Card statements of an individual named Paul Robinson.

5.   That it is the professional opinion of your affiant that corporate funds belonging to Weavewood have been misappropriated by the Defendant Howard Thompson.  Your affiants [sic] opinion is based on the following findings:

a.   That to the best of your affiant's knowledge, since August of 1995, Howard Thompson was never an employee of Weavewood or in a compensated officer position of the Company.  However, after reviewing certain canceled checks and bank statements your affiant has discovered that Howard Thompson had been writing checks from the Weavewood account to himself. The most recent of these incidents occurred on Friday July 12, 1996, and Tuesday July 16, 1996. * * * Your affiant has also discovered that on prior occasions, Howard Thompson has written other checks to himself from the Weavewood account, [and] after your affiant has had an opportunity to review all of the canceled checks an opinion as to the exact amount can be given to this court if requested.

b.   That Virgene Thompson does have a compensated position at Weavewood.  Your affiant has discovered that a number of checks from Weavewood have been written to Virgene Thompson, [and] after consulting with Ms. Thompson, she has advised your affiant that she has not received any monies from the company since August of 1995.  Attached hereto are three checks written to Virgene Thompson.[4]

c.   That after reviewing certain canceled checks, bank statements and credit card statements,

---

[4]Three of the checks attached to Mr. Caylor's affidavit were the same three checks discussed supra note 3 that were attached to Ms. Thompson's supplemental affidavit.  We note that the $1,000 check, the date of which is not shown in the Court's copy of the attachments to Ms. Thompson's supplemental affidavit, is shown in Mr. Caylor's affidavit as having a date of Feb. 26, 1996.

your affiant has discovered that corporate funds from Weavewood have been used to pay Howard Thompson's personal debt and other financial obligations of Howard Thompson. Attached hereto are canceled checks to Paul Robinson for payment of charges on Mr. Robinson's credit card; Check to Philip Villaume for personal legal services; Check to James Caveness [sic] who is a personal friend of Howard Thompson's and not an employee of Weavewood; See also attached Paul Robinson credit card statement of account for Howard Thompson. The Weavewood check ledger also indicates that Howard Thompson's personal auto lease was paid with Weavewood funds. As recent as Friday, July 19, 1996, Howard Thompson attempted to use Weavewood proceeds to pay for past due legal services. * * *

d. That it is your affiant's opinion that Howard Thompson has also violated his fiduciary duty to Weavewood, Inc. by investing corporate funds and selling stocks that had been with the company for decades and using the corporate proceeds to purchase volatile stocks when funds were needed to pay past due bills and operate the day to day operations of the Company. That your affiant has also discovered that Howard Thompson acting on behalf of the Company borrowed $50,000.00 from Norwest Bank and after reviewing numerous corporate records your affiant has found no evidence that these borrowed funds were used for the benefit of the company or for any business purpose. * * *

6. That your affiant is familiar with the office equipment and corporate automobile owned by or leased by Weavewood. That attached hereto is a copy of the title card for a 1992 Cadillac Allante which is owned by Weavewood, Inc. Also please find attached a lease agreement for certain pieces of computer equipment currently leased to Weavewood, Inc. * * *

Transactions Involving Petitioner and Checks
That Were Drawn on Weavewood's Checking Account

Weavewood's Checks That
Were Payable to Ms. Thompson

During February 1996, petitioner signed the following checks

(collectively, Weavewood's February 1996 checks) that were

payable to Ms. Thompson and drawn on Weavewood's checking account:

| Date of Check | Amount |
|---|---|
| February 15, 1996 | $20,000 |
| February 20, 1996 | 5,000 |
| February 26, 1996 | 1,000 |
| Total | $26,000 |

Ms. Thompson did not become aware of Weavewood's February 1996 checks until some time after petitioner signed them. As discussed above, in Ms. Thompson's supplemental affidavit which she wrote in July 1996 in connection with Weavewood's memorandum of law filed on July 22, 1996, Ms. Thompson denied having received any moneys from Weavewood since August 1995. It was petitioner who received the proceeds from Weavewood's February 1996 checks.[5]

Weavewood's Checks That Were Payable
to James Cavness or Phil Villaume

During February and April 1996, petitioner signed the following checks (collectively, Weavewood's February and April 1996 checks) that were payable to James Cavness (Mr. Cavness) or Phil Villaume (Mr. Villaume) and drawn on Weavewood's checking account:

---

[5]Petitioner deposited into petitioner's checking account the $5,000 check dated Feb. 20, 1996, (discussed above) and the $1,000 check dated Feb. 26, 1996 (discussed above). It is not clear from the record whether petitioner deposited the $20,000 check dated Feb. 15, 1996 (discussed above) into petitioner's checking account or cashed that check.

| Date of Check | Payee | Amount |
|---|---|---|
| February 19, 1996 | James Cavness | $150 |
| February 23, 1996 | Phil Villaume | 1,000 |
| April 2, 1996 | James Cavness | 200 |
| April 11, 1996 | James Cavness | 7,000 |
| | Total | $8,350 |

Petitioner used Weavewood's February and April 1996 checks either to make payments for petitioner's personal expenses or to make payments to a nominee of petitioner. In this connection, at the time petitioner signed Weavewood's February and April 1996 checks, Mr. Cavness was a personal friend of petitioner. More-over, at the time petitioner signed Weavewood's February and April 1996 checks, Mr. Villaume was an attorney practicing in the Minneapolis-St. Paul area of Minnesota, who during the years at issue had performed personal legal services on behalf of peti-tioner and whom Weavewood had not employed during any of those years.

Weavewood's Checks That
Were Payable to Petitioner

On July 12, 1996, the day on which Weavewood terminated petitioner, petitioner signed without Weavewood's authorization and later negotiated the following checks (collectively, Weavewood's July 12, 1996 checks) that were payable to petitioner and drawn on Weavewood's checking account:

| Date of Check | Amount |
|---|---|
| July 12, 1996 | $16,000 |
| July 12, 1996 | 16,750 |
| Total | $32,750 |

On July 16, 1996, when petitioner negotiated Weavewood's $16,750 check dated July 12, 1996 (Weavewood's July 12, 1996 check for $16,750) at Norwest Bank in Ridgedale (Norwest Bank-Ridgedale), he received $6,750 in cash and a $10,000 cashier's check ($10,000 cashier's check). On July 16, 1996, Weavewood placed a stop payment on Weavewood's July 12, 1996 check for $16,750. Consequently, Norwest Bank-Ridgedale voided the $10,000 cashier's check.

Weavewood's Checks That
Were Payable to Mr. Robinson

During March and April 1996, petitioner signed, or caused to be issued to Mr. Robinson, the following checks (collectively, Weavewood's March and April 1996 checks) that were payable to Mr. Robinson and drawn on Weavewood's checking account:

| Date of Check | Amount |
| --- | --- |
| March 11, 1996 | $4,848.09 |
| April 27, 1996 | 1,405.00 |
| Total | $6,253.09 |

Petitioner used Weavewood's March and April 1996 checks to make payments (petitioner's 1996 American Express card payments) to Mr. Robinson for personal expenses that petitioner incurred under the following arrangement (petitioner's arrangement with Mr. Robinson) that he had with Mr. Robinson regarding Mr. Robinson's American Express card. At a time around the end of 1993, when petitioner was unable to obtain any credit in his own name, petitioner approached Mr. Robinson to request access to Mr.

Robinson's American Express account (Mr. Robinson's American Express account) by having Mr. Robinson authorize American Express to issue a credit card in petitioner's name with respect to Mr. Robinson's American Express account. In return for Mr. Robinson's authorizing petitioner to have a credit card issued with respect to Mr. Robinson's American Express account, petitioner agreed that Mr. Robinson was to receive and retain all the points from American Express that accrued for each dollar of charges that petitioner incurred using that card. In January 1994, Mr. Robinson agreed to petitioner's arrangement with Mr. Robinson, and American Express issued a credit card to petitioner with respect to Mr. Robinson's American Express account (petitioner's American Express card issued on Mr. Robinson's American Express account). As part of petitioner's arrangement with Mr. Robinson, petitioner submitted to Mr. Robinson payments for charges that petitioner incurred on petitioner's American Express card issued on Mr. Robinson's American Express account.

During the time petitioner's arrangement with Mr. Robinson was in effect, American Express issued bills to Mr. Robinson for all charges made on Mr. Robinson's American Express account, including the charges that petitioner made on petitioner's American Express card issued on Mr. Robinson's American Express account. American Express held Mr. Robinson accountable for any charges that petitioner made on petitioner's American Express

card issued on Mr. Robinson's American Express account.

In April 1994, Mr. Robinson terminated petitioner's arrangement with Mr. Robinson after a dispute arose between Mr. Robinson and petitioner. In August 1995, Mr. Robinson resumed petitioner's arrangement with Mr. Robinson. That arrangement continued until July 18, 1996, when Mr. Robinson canceled petitioner's American Express card issued on Mr. Robinson's American Express account because petitioner failed to pay the charges that he had incurred on that account.

Weavewood's Checks That
Were Payable to Gold Key Lease

During May and June 1996, petitioner signed the following checks (collectively, Weavewood's May and June 1996 checks and individually, Weavewood's May 15, 1996 check and Weavewood's June 13, 1996 check) that were payable to Gold Key Lease (Gold Key) and drawn on Weavewood's checking account:

| Date | Amount |
|------|--------|
| May 15, 1996 | $549.99 |
| June 13, 1996 | 549.99 |

Petitioner used Weavewood's May and June 1996 checks to make payments to Gold Key for the lease (discussed below) of a 1995 Jeep Grand Cherokee (1995 Jeep Grand Cherokee).[6] During January, February, March, and April 1996, petitioner had paid for the

_____

[6]Petitioner's use of Weavewood's May 15, 1996 check to make the May 15, 1996 lease payment for the 1995 Jeep Grand Cherokee was the payment of a personal expense of petitioner.

lease of that vehicle by giving Gold Key in each of those months a $549.99 check that he signed, which was payable to Gold Key and drawn on petitioner's checking account.

In order to qualify to lease the 1995 Jeep Grand Cherokee from Gold Key, on December 27, 1994, Ms. Thompson and petitioner submitted to Gold Key a credit application (Gold Key credit application). That application indicated that Ms. Thompson was retired and that Uptime Nutrition employed petitioner. The Gold Key credit application did not indicate that Weavewood was applying for credit to lease the 1995 Jeep Grand Cherokee or that Weavewood was in any way connected with that application. Sometime in January 1995, Gold Key entered into a lease agreement (Gold Key lease agreement) with Ms. Thompson and petitioner for the lease of the 1995 Jeep Grand Cherokee. The Gold Key lease agreement indicated that Ms. Thompson and petitioner were the lessee and colessee, respectively. The Gold Key lease agreement did not indicate that Weavewood was a lessee or colessee or that Weavewood was in any way connected with that agreement. At no relevant time was the 1995 Jeep Grand Cherokee Weavewood's company vehicle.

Transactions Involving Petitioner and
Checks That Were Payable to Weavewood

July 16, 1996 Checks

On July 16, 1996, after Weavewood terminated petitioner, petitioner deposited into petitioner's checking account the

following checks that were payable to Weavewood (collectively, July 16, 1996 checks that were payable to Weavewood):

| Payor | Amount |
|---|---|
| Nearly New Restaurant Equip. & Supplies | $3,466.08 |
| Stratosphere | 2,743.20 |
| Rykoff-Sexton, Inc. | 2,290.26 |
| Fri City | 382.88 |
| Rykoff-Sexton, Inc. | 365.29 |
| Don | 355.48 |
| United Restaurant Equip. | 298.63 |
| DBA The Miners Bldg. | 275.24 |
| SS Kemp & Co. | 165.86 |
| L & M Food Service | 146.46 |
| Tinkels | 139.85 |
| Spanky's - Fredericksburg | 50.50 |
| Boelter | 40.58 |
| Total | $10,720.31 |

Petitioner's deposit into petitioner's checking account of the July 16, 1996 checks that were payable to Weavewood was done without Weavewood's authorization and constituted a conversion of those checks.

July 22, 1996 Checks

On July 22, 1996, petitioner deposited into petitioner's checking account the following checks that were payable to Weavewood (collectively, July 22, 1996 checks that were payable to Weavewood):

| Payor | Amount |
|-------|--------|
| Harrah's | $6,108.80 |
| Don | 933.46 |
| PFS | 890.25 |
| Harrah's | 198.79 |
| Brown | 156.93 |
| Total | $8,288.23 |

Petitioner's deposit into petitioner's checking account of the July 22, 1996 checks that were payable to Weavewood was done without Weavewood's authorization and constituted a conversion of those checks.

Transaction Involving Petitioner
With Respect to Timmerman Leasing

On February 14, 1996, petitioner received a $6,000 check (February 14, 1996 check) from or through Weavewood. The February 14, 1996 check related to a sale-leaseback transaction that petitioner had negotiated with Timmerman Leasing on behalf of Weavewood.

Transactions Involving Petitioner and
Checks That Were Payable to Mr. Thompson

At a time not disclosed by the record before 1991, Mr. Thompson, petitioner's father, made an investment with respect to the leasing of certain airplanes (Mr. Thompson's investment) through a program known as Polaris Aircraft Investment Program 1983 (Polaris). Pursuant to that program, every six months Polaris issued a check payable to Mr. Thompson with respect to Mr. Thompson's investment. After Mr. Thompson's death in 1991,

Polaris continued to issue every six months checks that were payable to Mr. Thompson with respect to Mr. Thompson's investment.

On January 31, 1995, Polaris issued a $4,962.50 check payable to Mr. Thompson (January 31, 1995 check). Petitioner negotiated the January 31, 1995 check at First Bank.

On July 31, 1995, Polaris issued a $4,962.50 check payable to Mr. Thompson (July 31, 1995 check). Petitioner, Ms. Thompson, and Donald D. Kallestad (Mr. Kallestad), whom Weavewood employed during 1995 and 1996, endorsed the July 31, 1995 check. On a date not disclosed by the record between July 31 and August 4, 1995, petitioner negotiated the July 31, 1995 check by giving it to Mr. Kallestad as a loan. On August 4, 1995, Mr. Kallestad deposited that check into his personal checking account (Mr. Kallestad's personal checking account) at Norwest Bank-Minneapolis. Approximately two or three months after Mr. Kallestad deposited the July 31, 1995 check into Mr. Kallestad's personal checking account, Mr. Kallestad gave petitioner $4,962.50 in repayment of the loan that he received from petitioner.

On January 31, 1996, Polaris issued a $4,962.50 check payable to Mr. Thompson (January 31, 1996 check). Petitioner negotiated the January 31, 1996 check.

On July 31, 1996, Polaris issued a $4,962.50 check payable to Mr. Thompson (July 31, 1996 check). Petitioner negotiated the

July 31, 1996 check by endorsing it to an individual named Gayle Bjorkland.

## Sale of Petitioner's Arcade Games

Around May 1, 1996, petitioner sold 10 arcade games (arcade games) to Reality Entertainment, a company located in Des Moines, Iowa. Petitioner and Mr. Robinson delivered those arcade games to Reality Entertainment. Reality Entertainment financed the purchase of the arcade games through Norwest Equipment Finance, Inc. (Norwest Equipment Finance), a company located in Minneapolis. On May 1, 1996, Norwest Equipment Finance issued a $16,450 check (May 1, 1996 check) payable to petitioner and drawn on its account at Norwest Bank-Minneapolis as payment to petitioner for the sale of the arcade games (petitioner's sales proceeds from the sale of the arcade games). Petitioner endorsed the May 1, 1996 check and sent it to Mr. Kallestad at Weavewood, which Mr. Kallestad received on or about May 6, 1996. On May 6, 1996, at petitioner's request, Mr. Kallestad arranged through Norwest Bank of Wayzata, Minnesota, to have petitioner's sales proceeds from the sale of the arcade games wired to petitioner at Caesar's Tahoe casino.

## Ms. Thompson's Tax Returns for 1994, 1995, and 1996

Ms. Thompson filed Form 1040, U.S. Individual Income Tax Return (Form 1040), for each of her taxable years 1994 (Ms. Thompson's 1994 return), 1995 (Ms. Thompson's 1995 return), and

1996 (Ms. Thompson's 1996 return). In Ms. Thompson's 1994 return, Ms. Thompson reported $7,000 of wage income from Weavewood, $114 of taxable interest income which, in a statement with respect to such interest income that she attached to that return,[7] she indicated was from "Polaris Aircraft Investment Program", and $22,741 of Social Security benefits, of which $195 was reported as taxable. In Schedule E, Supplemental Income and Loss (Schedule E), included as part of Ms. Thompson's 1994 return (Ms. Thompson's 1994 Schedule E), Ms. Thompson reported $10,560 in rents received from "An undivided 1/2% interest in four used aircraft Pittsburg [sic], PA",[8] $655 in expenses, and $9,905 in total rental real estate income.

In Ms. Thompson's 1995 return, Ms. Thompson reported $5,500 of wage income from Weavewood, $178 of taxable interest income, and $350 of taxable refunds, credits, or offsets of State and local income taxes. In Schedule B included as part of Ms. Thompson's 1995 return, Ms. Thompson indicated that the $178 of taxable interest income that she reported was from "POLARIS".

---

[7]Ms. Thompson did not include Schedule B, Interest and Dividend Income (Schedule B), as part of Ms. Thompson's 1994 return.

[8]Although not altogether clear from the record, it appears that the $10,560 in rents received from "An undivided 1/2% interest in four used aircraft Pittsburg [sic], PA" reported in Ms. Thompson's 1994 Schedule E related to checks that were payable to Mr. Thompson and that Polaris issued in 1994 with respect to Mr. Thompson's investment.

Ms. Thompson did not include Schedule E as part of Ms. Thompson's 1995 return.

In Ms. Thompson's 1996 return, Ms. Thompson reported only $171 of taxable interest income. In Schedule B included as part of Ms. Thompson's 1996 return, Ms. Thompson indicated that the $171 of taxable interest income that she reported was from "POLARIS". Ms. Thompson did not include Schedule E as part of Ms. Thompson's 1996 return.

Petitioner's Tax Returns
for 1994, 1995, and 1996

Petitioner filed Form 1040 for his taxable year 1995 (petitioner's 1995 return). In petitioner's 1995 return, petitioner reported $25,200 of wage income from Uptime Nutrition. In Schedule C, Profit or Loss From Business (Schedule C), included as part of petitioner's 1995 return (petitioner's 1995 Schedule C), petitioner reported that he was in the vending business and that he had gross income of $4,750 and expenses of $4,483, including $1,597 of car and truck expenses. A vehicle expense worksheet attached to petitioner's 1995 Schedule C indicated that the car and truck expenses claimed in that schedule related to a Jeep Grand Cherokee that was placed into service on January 1, 1995.

Petitioner did not file tax returns for his taxable years 1994 and 1996.

Notice

Respondent issued a notice to petitioner with respect to his

taxable years 1994, 1995, and 1996.  In that notice, respondent determined, inter alia, that for each of the years 1995 and 1996 petitioner has unreported income of $9,925 from Polaris.  Respondent further determined in the notice that for 1996 petitioner has unreported income of $16,450 from the sale of vending machines[9] and $122,391 of unreported "EMBEZZELMENT [sic] FORM 1099" income.  Respondent further determined in the notice that petitioner is liable for 1996 for an addition to tax under section 6651(a)(1).

## OPINION

Petitioner bears the burden of showing error in the determinations in the notice that remain at issue.[10]  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The only issues that remain for decision relate to (1) certain alleged unreported income for each of the taxable

---

[9]In the notice, respondent erroneously referred to the arcade games that petitioner sold to Reality Entertainment around May 1, 1996, as vending machines.  Petitioner does not dispute that respondent's determination in the notice with respect to the $16,450 of unreported income for 1996 relates to the sale of the arcade games.

[10]Petitioner does not contend that sec. 7491 is applicable in this case.  Even if petitioner had advanced such a contention, he has not established that he has complied with the applicable requirements of sec. 7491(a)(2).  Under the circumstances presented in this case, we conclude (1) that the burden of proof does not shift to respondent under sec. 7491(a)(1) with respect to the deficiency determinations and (2) that respondent does not have the burden of production under sec. 7491(c) with respect to the addition to tax under sec. 6651(a)(1).

years 1995 and 1996 and (2) the addition to tax under section 6651(a)(1) for the taxable year 1996.  We turn first to the alleged unreported income.

The unreported income items at issue for 1995 pertain to petitioner's use of the January 31, 1995 check and the July 31, 1995 check, both of which were payable to Mr. Thompson, petitioner's father, and issued by Polaris with respect to Mr. Thompson's investment.  The unreported income items at issue for 1996 pertain to:  (1) Petitioner's use of Weavewood's February 1996 checks that were payable to Ms. Thompson and drawn on Weavewood's checking account; (2) petitioner's use of Weavewood's February and April 1996 checks that were payable to Mr. Cavness or Mr. Villaume and drawn on Weavewood's checking account; (3) petitioner's use of Weavewood's July 12, 1996 checks that were payable to petitioner and drawn on Weavewood's checking account; (4) petitioner's use of Weavewood's March and April 1996 checks that were payable to Mr. Robinson and drawn on Weavewood's checking account; (5) petitioner's use of Weavewood's May and June 1996 checks that were payable to Gold Key and drawn on Weavewood's checking account; (6) petitioner's use of the July 16, 1996 checks and the July 22, 1996 checks that were payable to Weavewood; (7) petitioner's receipt of the February 14, 1996 check relating to Timmerman Leasing; (8) petitioner's use of the January 31, 1996 check and the July 31, 1996 check, both of which

were payable to Mr. Thompson, petitioner's father, and issued by Polaris with respect to Mr. Thompson's investment; and (9) petitioner's receipt of petitioner's sales proceeds from the sale of the arcade games.

In support of his position that he does not have the unreported income at issue for 1995 and 1996, petitioner relies on his testimony. In an Order dated May 13, 2003, at the call of this case from the calendar on June 2, 2003, and at the trial of this case on June 3, 2003, the Court advised petitioner that he may not introduce at the trial in the instant case any evidence that is inconsistent with or contrary to the deemed admissions and the deemed stipulations in this case.

At trial, respondent objected to certain of petitioner's testimony on the ground that it was inconsistent with or contrary to certain of the deemed admissions and deemed stipulations in this case. The Court sustained respondent's objections to the extent the Court found petitioner's proffered testimony to be inconsistent with or contrary to certain of those admissions and stipulations. Nonetheless, petitioner persisted in proffering testimony, to which respondent objected as inconsistent with or contrary to certain of the deemed admissions and deemed stipulations in this case. In order to facilitate the trial in this case without repeated objections by respondent, the Court allowed respondent to make a standing objection to petitioner's testimony

- 31 -

on the ground that it was inconsistent with or contrary to certain of those admissions and stipulations. The Court directed respondent to bring to the Court's attention on brief any of petitioner's testimony to which respondent objected as inconsistent with or contrary to certain of the deemed admissions and deemed stipulations in this case and informed the parties that it would deem stricken from the record any such inconsistent or contrary testimony.

The Court deems stricken from the record in the instant case any testimony of petitioner that is inconsistent with or contrary to the deemed admissions and the deemed stipulations in this case. Assuming arguendo that the Court had not deemed such testimony stricken, the Court would not rely on petitioner's testimony to establish his position that he does not have the unreported income at issue for 1995 and 1996. That is because the Court found petitioner's testimony to be in material respects not credible, general, conclusory, vague, self-serving, uncorroborated, and/or inconsistent with certain other evidence in the record.

Transactions Involving Petitioner and Weavewood

The following are the unreported income items at issue for 1996 which relate to petitioner's use in that year of various checks that were drawn on Weavewood's checking account, that were payable to Weavewood, or that petitioner received from or through

Weavewood, all of which respondent included as part of the adjustment in the notice, referred to as "EMBEZZELMENT [sic] FORM 1099", to increase petitioner's income for 1996 by $122,391:[11] (1) Petitioner's use of Weavewood's February 1996 checks that were payable to Ms. Thompson and drawn on Weavewood's checking account; (2) petitioner's use of Weavewood's February and April 1996 checks that were payable to Mr. Cavness or Mr. Villaume and drawn on Weavewood's checking account; (3) petitioner's use of Weavewood's July 12, 1996 checks that were payable to petitioner and drawn on Weavewood's checking account; (4) petitioner's use of Weavewood's March and April 1996 checks that were payable to Mr. Robinson and drawn on Weavewood's checking account; (5) petitioner's use of Weavewood's May and June 1996 checks that were payable to Gold Key and drawn on Weavewood's checking account; (6) petitioner's use of the July 16, 1996 checks and the July 22, 1996 checks that were payable to Weavewood; and (7) petitioner's receipt of the February 14, 1996 check relating

---

[11]The amount of $122,391 by which respondent determined in the notice to increase petitioner's income for 1996 was the amount reported in Form 1099-MISC, Miscellaneous Income (Form 1099), that Weavewood issued for that year with respect to petitioner (Weavewood's Form 1099). In preparation for trial, respondent reconstructed various items of unreported income for 1996, which were included as part of the $122,391 total amount of income reported in Weavewood's Form 1099. Except for the unreported income items for 1996 that we address herein, respondent concedes the balance of the $122,391 of unreported income for 1996 that respondent determined in the notice as an adjustment referred to in the notice as "EMBEZZELMENT [sic] FORM 1099".

to Timmerman Leasing.

With respect to the foregoing unreported income items at issue for 1996, petitioner testified in part as follows:

The embezzlement issue on the 1099 form[12] has already been ruled on, in December 2001, by the Honorable Hennepin County District Court Judge Myron Greenberg, in which his order specifically writes that the $122,391 -- and I believe it was 87 cents -- which is missing from this particular entry, was null and void, and should be reclassified as $0.00.

In addition, on brief petitioner

denies all claimes made in the 91 F motion and has consistantly denied these bogas alegations. Petitioner fought in state district court the exact same claims and after nearly (4) four years of trial and pretrial Judge Myron Greenburg ruled all of these claims to be untrue. This Court has no jurisdiction to rule on the same claims already decided. * * * [Reproduced liter-ally.]

Respondent counters that

Petitioner did not articulate any credible explanation at trial why the income attributed to him from his misappropriations from Weavewood would not be income to him. He testified that a Hennepin County District Judge had ruled that the Form 1099 issued by Weavewood was null and void and should be reclassified as zero * * * but he presented no documentary evidence corrobo-rating his claim about either the ruling or the basis for the ruling. Even if such an order had been en-tered, however, it has no legal effect on this case, since petitioner did not claim, and respondent would have contested such a claim if it had been made, that respondent was a party to the state court proceeding. Furthermore, this proceeding [the instant case] would have been the appropriate forum in which to raise the issue whether the Form 1099 was accurate or not, not in a state court action. Respondent notes that, according to petitioner's testimony, the state court ruling would

---

[12]See supra note 11.

have occurred two years after petitioner brought this proceeding in the Tax Court.

In any event, respondent's position in this case is not dependent on the accuracy of the Form 1099 issued by Weavewood. * * * Rather than relying on the Weavewood 1099 in preparing for trial, respondent has reconstructed the amount of petitioner's misappropriations from Weavewood and proved the specific items of income includible in the reconstruction. * * *

Most of the evidence on this issue has been established by respondent through the admissions and stipulation process * * * .

We reject petitioner's argument that we do not have jurisdiction over the determination in the notice referred to as "EMBEZZELMENT [sic] FORM 1099". Moreover, even if the record had established, which it does not, that a proceeding before a Hennepin County District Court Judge addressed and ruled on that determination, we would not be bound by any such ruling.

Weavewood's February 1996 Checks

With respect to petitioner's use of Weavewood's February 1996 checks that were payable to Ms. Thompson and drawn on Weavewood's checking account, the record establishes that petitioner received the proceeds of those checks. On the record before us, we find that petitioner has failed to carry his burden of showing that he used those proceeds for or on behalf of Weavewood. On that record, we further find that petitioner has failed to carry his burden of showing that he does not have unreported income of $26,000 for 1996 from his use of Weavewood's

February 1996 checks that were payable to Ms. Thompson and drawn on Weavewood's checking account.[13]

Weavewood's February and April 1996 Checks

With respect to petitioner's use of Weavewood's February and April 1996 checks that were payable to Mr. Cavness or Mr. Villaume and drawn on Weavewood's checking account, the record establishes that petitioner used those checks to make payments for petitioner's personal expenses or to make payments to a nominee of petitioner. On the record before us, we find that petitioner has failed to carry his burden of showing that he used those checks for or on behalf of Weavewood. On that record, we further find that petitioner has failed to carry his burden of showing that he does not have unreported income of $8,350 for 1996 from his use of Weavewood's February and April 1996 checks that were payable to Mr. Cavness or Mr. Villaume and drawn on Weavewood's checking account.

Weavewood's July 12, 1996 Checks

With respect to petitioner's use of Weavewood's July 12, 1996 checks that were payable to petitioner and drawn on

---

[13]As discussed above, in Ms. Thompson's supplemental affidavit which she wrote in July 1996 in connection with Weavewood's memorandum of law filed on July 22, 1996, Ms. Thompson denied having received any moneys from Weavewood since August 1995. Moreover, Ms. Thompson did not report as income in Ms. Thompson's 1996 return Weavewood's February 1996 checks totaling $26,000 that were payable to her, that petitioner signed, and that were drawn on Weavewood's checking account.

Weavewood's checking account, the record establishes that petitioner signed and negotiated those checks without Weavewood's authorization. On the record before us, we find that petitioner has failed to carry his burden of showing that he used those checks for or on behalf of Weavewood. On that record, we further find that petitioner has failed to carry his burden of showing that he does not have unreported income of $22,750[14] for 1996 from his use of Weavewood's July 12, 1996 checks that were payable to petitioner and drawn on Weavewood's checking account.

Weavewood's March and April 1996 Checks

With respect to petitioner's use of Weavewood's March and April 1996 checks that were payable to Mr. Robinson and drawn on Weavewood's checking account, the record establishes that petitioner used those checks to make petitioner's 1996 American Express card payments, which were for personal expenses of petitioner. On the record before us, we find that petitioner has failed to carry his burden of showing that any of the charges that petitioner made on petitioner's American Express card issued on Mr. Robinson's American Express account were incurred for or

---

[14]In determining that petitioner has unreported income of $22,750 as a result of petitioner's use of Weavewood's July 12, 1996 checks, respondent added the amounts of Weavewood's July 12, 1996 checks for $16,000 and $16,750, respectively, and reduced that sum ($32,750) by $10,000 to take account of the fact that Norwest Bank-Ridgedale voided the $10,000 cashier's check that petitioner received (along with $6,750 in cash) on July 16, 1996, when he negotiated Weavewood's July 12, 1996 check for $16,750.

on behalf of Weavewood.  On that record, we further find that petitioner has failed to carry his burden of showing that he does not have unreported income of $6,253.09 for 1996 from his use of Weavewood's March and April 1996 checks that were payable to Mr. Robinson and drawn on Weavewood's checking account.

Weavewood's May 15, 1996 Check

With respect to petitioner's use of Weavewood's May 15, 1996 check that was payable to Gold Key and drawn on Weavewood's checking account, the record establishes that petitioner used that check to make the May 15, 1996 lease payment for the 1995 Jeep Grand Cherokee, which was a personal expense of petitioner. On the record before us, we find that petitioner has failed to carry his burden of showing that he used the May 15, 1996 check that was payable to Gold Key and drawn on Weavewood's checking account for or on behalf of Weavewood.  On that record, we further find that petitioner has failed to carry his burden of showing that he does not have unreported income of $549.99 for 1996 from his use of that check.

Weavewood's June 13, 1996 Check

With respect to petitioner's use of Weavewood's June 13, 1996 check that was payable to Gold Key and drawn on Weavewood's checking account, the record establishes that petitioner used that check to make the June 13, 1996 lease payment for the 1995 Jeep Grand Cherokee.  Petitioner testified that Weavewood made

certain payments for the lease of the 1995 Jeep Grand Cherokee because Ms. Thompson used that vehicle for company business. We reject that testimony, which is contrary to other evidence in the record. The record establishes that, as of February 16, 1996, Weavewood's company vehicle was a Cadillac, and not a 1995 Jeep Grand Cherokee, and that Ms. Thompson, among others, drove that Cadillac in connection with Weavewood business. The record further establishes that the Gold Key credit application for the lease of the 1995 Jeep Grand Cherokee indicated that Ms. Thompson and petitioner were applying for credit for that lease and did not indicate that Weavewood was applying for credit to lease that vehicle or that Weavewood was in any way connected with that application. The record also shows that the Gold Key lease agreement for the 1995 Jeep Grand Cherokee indicated that Ms. Thompson and petitioner were lessee and colessee, respectively, and did not indicate that Weavewood was a lessee or colessee or that Weavewood was in any way connected with that agreement. Furthermore, during the first four months of 1996, petitioner paid for the lease of the 1995 Jeep Grand Cherokee by signing checks that were payable to Gold Key and drawn on petitioner's checking account. Moreover, a vehicle expense worksheet associated with petitioner's 1995 Schedule C indicated that the car and truck expenses claimed in that schedule related to a Grand Cherokee that was placed into service on January 1, 1995. In

addition, Mr. Caylor's affidavit indicated that petitioner used Weavewood's funds to pay for the lease of petitioner's personal automobile lease. On the record before us, we find that petitioner has failed to carry his burden of showing that he used for or on behalf of Weavewood the June 13, 1996 check that was payable to Gold Key and drawn on Weavewood's checking account. On that record, we further find that petitioner has failed to carry his burden of showing that he does not have unreported income of $549.99 for 1996 from his use of that check.

July 16, 1996 Checks and July 22, 1996
Checks That Were Payable to Weavewood

With respect to petitioner's use of the July 16, 1996 checks and the July 22, 1996 checks that were payable to Weavewood, the record establishes that petitioner deposited those checks into petitioner's checking account without Weavewood's authorization and that such deposits constituted a conversion of those checks. On the record before us, we find that petitioner has failed to carry his burden of showing that he used those checks for or on behalf of Weavewood. On that record, we further find that petitioner has failed to carry his burden of showing that he does not have unreported income of $10,720.31 and $8,288.23, respectively, for 1996 from his use of the July 16, 1996 checks and the July 22, 1996 checks that were payable to Weavewood.

February 14, 1996 Check

With respect to the February 14, 1996 check relating to

Timmerman Leasing, the record establishes that petitioner received that check. On the record before us, we find that petitioner has failed to carry his burden of showing that he used that check for or on behalf of Weavewood. On that record, we further find that petitioner has failed to carry his burden of showing that he does not have unreported income of $6,000 for 1996 from his receipt of the February 14, 1996 check relating to Timmerman Leasing.

Transactions Involving Petitioner and
Checks That Were Payable to Mr. Thompson

With respect to petitioner's use (1) in 1995 of the January 31, 1995 check and the July 31, 1995 check and (2) in 1996 of the January 31, 1996 check and the July 31, 1996 check, all of which were payable to Mr. Thompson, petitioner's father, and issued by Polaris with respect to Mr. Thompson's investment, petitioner claims on brief that he cashed those checks for, and that he gave the proceeds from those checks to, his mother Ms. Thompson. Ms. Thompson's 1995 return and Ms. Thompson's 1996 return belie that claim. In Ms. Thompson's 1995 return and Ms. Thompson's 1996 return, Ms. Thompson reported taxable interest income from "POLARIS" of $178 and $171, respectively. Ms. Thompson did not report (1) in Ms. Thompson's 1995 return the January 31, 1995 check and the July 31, 1995 check payable to Mr. Thompson and issued by Polaris or (2) in Ms. Thompson's 1996 return the January 31, 1996 check and the July 31, 1996 check payable to Mr.

Thompson and issued by Polaris.  Nor did Ms. Thompson report in Ms. Thompson's 1995 return or in Ms. Thompson's 1996 return rents received from "An undivided 1/2% interest in four used aircraft Pittsburg [sic], PA" or any other amount attributable to Mr. Thompson's investment.[15]  On the record before us, we find that petitioner has failed to carry his burden of showing that he does not have:  (1) Unreported income of $4,962.50 and $4,962.50, respectively, for 1995 from his use of the January 31, 1995 check and the July 31, 1995 check, which were payable to Mr. Thompson and issued by Polaris with respect to Mr. Thompson's investment;

---

[15]Pursuant to Rule 90(c), the following matters are deemed admitted:

> 4.  On October 16, 2001, petitioner, alleging to respondent that his mother was the actual recipient of certain income items that were attributable to petitioner in the statutory notice of deficiency, told respondent in the presence of his mother that his mother would amend her federal income tax returns for 1995 and 1996 to report the income.

> 5.  Although respondent stated that he expected any amended returns to be sent to him and to be filed within thirty days of the meeting and although respondent informally extended the deadline for filing the amended tax returns, the last time to March 5, 2002, no amended returns have been filed by petitioner or his mother.

As of the trial in this case, petitioner had not proffered any amended return of Ms. Thompson for 1995 reflecting that she reported for that year the January 31, 1995 check and the July 31, 1995 check payable to Mr. Thompson and issued by Polaris or any amended return for 1996 reflecting that she reported the January 31, 1996 check and the July 31, 1996 check payable to Mr. Thompson and issued by Polaris.

and (2) unreported income of $4,962.50 and $4,962.50,[16] respectively, for 1996 from his use of the January 31, 1996 check and the July 31, 1996 check, which were payable to Mr. Thompson and issued by Polaris with respect to Mr. Thompson's investment.

Sale of Petitioner's Arcade Games

With respect to petitioner's receipt of petitioner's sales proceeds from the sale of the arcade games, petitioner claims on brief that he gave those proceeds to his mother, Ms. Thompson. Ms. Thompson's 1996 return belies that claim. Ms. Thompson did not report in Ms. Thompson's 1996 return petitioner's sales proceeds from the sale of the arcade games.[17] On the record before us, we find that petitioner has failed to carry his burden of showing that he does not have unreported income of $16,450 for 1996 from his receipt of petitioner's sales proceeds from the

_____

[16]Respondent acknowledges that the deemed admissions contain a mathematical error in showing (1) the total of the January 31, 1995 check for $4,962.50 and the July 31, 1995 check for $4,962.50 as $9,950 and (2) the total of the January 31, 1996 check for $4,962.50 and the July 31, 1996 check for $4,962.50 as $9,950. The correct total of the two checks issued in 1995 is $9,925, as is the correct total of the two checks issued in 1996. Such correct totals shall be reflected in the parties' computations under Rule 155.

[17]As indicated supra note 15, on Oct. 16, 2001, in the presence of his mother, petitioner told respondent that his mother was the actual recipient of certain income items that were attributable to petitioner in the notice and that his mother would amend her Federal income tax returns for 1995 and 1996 in order to report such income items. As of the trial in this case, petitioner had not proffered any amended return of Ms. Thompson for 1996 reflecting that she reported for that year petitioner's sales proceeds from the sale of the arcade games.

sale of the arcade games.[18]

## Addition to Tax Under Section 6651(a)(1)

Respondent determined that petitioner is liable for 1996 for an addition to tax under section 6651(a)(1). The record establishes that petitioner did not file a tax return for 1996. Petitioner claims that he does not have the requisite amount of income that would have required him to file a tax return for that year. The record in the instant case belies that claim. In a stipulation of settled issues filed by the parties on April 16, 2002, petitioner conceded that for 1996 he has $6,178 of income, consisting of $4,000 of income with respect to his employment by Uptime Nutrition and $2,178 of income with respect to unemployment compensation from the Minnesota Department of Economic Security. Based on petitioner's concessions alone, he was required to file a tax return for 1996.[19] See sec. 6012. On the record before us, we find that petitioner has failed to carry his burden of showing that he is not liable for an addition to tax under section 6651(a)(1) for 1996.

We have considered all of the contentions and arguments of petitioner that are not discussed herein, and we find them to be

---

[18]Petitioner does not contend, and has failed to establish, that he has a basis in the arcade games that he sold to Reality Entertainment.

[19]In addition to the $6,178 of income that petitioner conceded he has for 1996, we have found that petitioner has $115,836.61 of income for that year.

without merit and/or irrelevant.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.